Our third case for this morning is United States v. Carnell. Mr. Hillis. Daniel Hillis May it please the court. Counsel, my name is Daniel Hillis. I'm with the Federal Public Defender's Office. I represent Mr. Carnell. The district court erred when it found methamphetamine that Mr. Carnell sold was ice under the guideline definition of ice. That guideline requires that the substance be D-methamphetamine hydrochloride at least 80% purity. So counsel, typically the government can use circumstantial evidence to prove things under the guidelines like what was this substance. So is your position that a percentage is just fundamentally different and so it changes the proof on which the government can rely? It is, Your Honor, and there's simple reasons for that. You can charge whatever price you want for something. You can call it whatever you want. And if you do all of these things under the McIntyre factors, for instance, that doesn't mean that the substance that tests at 50% purity is ice. Notwithstanding all those other indicia that we would take from McIntyre and try to say that historically under the court's case law that that would be enough to make it, say, cocaine or to do other things that would be consistent with identifying a substance of a particular type. When we want a meth sentence and something is meth, that's fine. But when we want a sentence based on ice, we need to come in with the requisite proof of the 80% purity level. And it's done through lab reports. Would you say that for each sample that you just can't, that everything has to be tested to make sure that you're at that 80% purity level? There is a problem, Your Honor, that if we have some sample that's 80% pure D-methamphetamine hydrochloride and everything else isn't, that we cannot regard the evidence as being dispositive of this. Right, but our case looks a little different. I mean, I think you're making a very serious argument, I'll say. And it's not one that other courts have accepted, so it would require some, you know, the Eighth Circuit doesn't seem to be there. Even the Castaneda decision doesn't seem to be there. There were a couple of samples tested that came in, it's a little absurd, 100%, plus or minus 4%. We'll just call that 100%, maybe minus 4%. So we don't have the example of tested samples in a lab capable of doing that test, the DEA lab, coming in, you know, at 75% and at 100% and something. So can you extrapolate, or is it really every sample? There's a problem if you were to extrapolate, Judge. Suppose you have one test that is based on a one gram bi, and that is ice. And then you have testimony about everything else, and you have no lab report, and you're talking about kilos now. We are skewing the sentence based on a single sample that is unrepresentative, perhaps, of the mass of drugs that have been... But that's a question of sufficiency, right? That would be, if we accepted the Eighth Circuit's approach and said that circumstantial evidence could be used, one lab report, like in this case, there's a lab report that provides some circumstantial evidence, but then there's also the testimony of the agents who described this looking like shards. There's also his referring to it as ice, which, while I agree is not dispositive, I think can be a piece of evidence. And on the shards point, I have a question, because I don't know how meth and its transformation into ice works. In terms of figuring out how significant it was that the appearance was like shards, is there some point at which, like, hey, it doesn't look like shards until it crosses the 80% threshold, or does 70% purity have an appearance of shards? Right. I think the testimony from the users were that shards can manifest themselves and not be 80% pure D-methamphetamine hydrochloride. So that look test, that taste test, all these other things that these users are saying, these are not things that reliably demonstrate that this is ice. And, of course, you're entitled to be sentenced based on reliable evidence. And so this all begs the question again about what evidence is sufficient under the guidelines. And I would say that we also need to keep in mind, for what the guidelines say, the more fundamental principles of due process that we're going to get to here shortly, I hope, but also about the reliability of the evidence as a whole. And I don't think that anyone can say, based on everything that has been recounted in the district court, that you can say reliably, reliable evidence established that all of this was ice. Are you aware of any district courts that have taken this approach? Sorry. Of requiring lab reports, I mean. So we have the 8th Circuit saying circumstantial evidence, okay. There's our Castaneda opinion, which doesn't get to this point, but kind of has this drift. Are you aware of district courts that have accepted this argument that it has to be lab reports? I'm not, but I will say that I think that is because people have looked at these other cases, like McIntyre, cases from the 8th Circuit, other places, and they might have thought that this is a foregone conclusion, that you cannot make these challenges. And I think that was a misstep for anybody who would put stock in that, saying that it is now squelched, an argument of this type. You know, you could. I mean, I'm wondering if there's some intermediate position, because as Judge Barrett was suggesting, if some chemist were to testify, I know it didn't happen here, so I assure you I know this isn't there, but if a chemist were to testify, you know, methamphetamine just doesn't take on that glassy, shard-like look until it's 90% pure or something. Testimony to that effect. Then you would have a link back to the visual observations that would allow you to say, well, I mean, it doesn't look like that until it's 90% pure. We have testimony, but we don't have even that here. Right. That would be very helpful evidence for the government. And of course, we have lots of problems about the decision not to call the chemist to testify about the reports and the ability of law enforcement officers to testify about those or for their admission and consideration ultimately by the district court. But this was sentencing, right? I mean, just to address that for a minute. Some cases and other cases are not sentencing. But if I may provide what I think is a necessary link here, Your Honor, Francis. Francis talks about the due process right that extends even to sentencing. And so it would be, it might be absurd that we would have a right to confront somebody about some powerful piece of evidence that is so fundamental to the determination of the case. But we've said the Confrontation Clause doesn't apply in sentencing. That's true, but we've also said that due process does. But it sounds to me like your position is, well, the Confrontation Clause doesn't apply, but through the Due Process Clause, it does. But it does. So I can cite Jordan, for instance, where it's a limited due process right in a revocation hearing which has fewer protections that attach there relative to criminal proceedings. And yet, we find that there is a due process right to confront an adverse witness. And in that case, there was a police officer who testified about something being marijuana. So I think that there is definitely due process protections that support our position here, Your Honor. Reliability is a different thing from confrontation. Oh, please, go ahead, Judge Romner. Was there any evidence to show that users can detect if ice is less than 80% pure? I mean, maybe users don't notice a change in purity until it drops below 75%. How did the government meet its burden here, do you think? How did it or how can it, Your Honor? I'm sorry. She said how did, but you can answer first how did, and then you can. I don't think it did meet its burden, Your Honor. I think that is something that they could have tried to do through calling chemists, through a testimony. Instead, they relied on users who, these users testified there's good ice, there's bad ice. I think that suggests that this is not always the case that when they're saying that they're using the term ice, that they mean a substance that denotes D-amphetamine 80% purity. No, I mean, that's very seat of the pants evidence, good ice and bad ice. It doesn't tell you much about 80, 81, 79. Right, and Judge Romner, furthermore, some of the testimony by the users were that it based on how it tastes and how it makes them feel. But, of course, there are threshold considerations of tolerance and other things, too, and subjective measurements different from each user. These are things that are just too amorphous for the district court to put stock in and say this is reliable evidence. And yet it did, and it wasn't very specific about ultimately what it relied on. So I would like to say for the things that are here, we know that five of the lab reports, A, B, C, D, and E, were tested, and they only showed methamphetamine. They don't tell you one way or the other because those labs didn't have the capacity. Fair point. So I, frankly, as I looked at this, sort of disregarded A, B, C, D, and E because they just didn't have the ability to answer the question on the table. You're right, but I think we mentioned in the brief then submit those as samples for additional testing to another lab. It wasn't done, so it suggests to me that perhaps they wouldn't test positive. So for the lab reports that we have remaining, G1, G2, and I, I is a sample that's obtained from a different co-conspirator in a different conspiracy. That is not indicia of anything in our case. Weren't there links, though, between Mr. Carnell and Sample I? I thought there were. There was testimony that he purchased Sample I from somebody else, Mr. Higgins, but that's a different conspiracy. And as I understand the law of the circuit, when you're buying drugs from a different person, a different conspiracy, that is not evidence then of the substance that's at issue in the other conspiracy, in the other case. And furthermore, you don't know that the samples that he's buying, one versus the other, are the same. Presumably these things are of different qualities when they are made and sold, and we don't have much to say that this is the same substance. And so we are left with G1 and 2, and we don't have testimony from a chemist. We don't have anything that's consistent in the lab reports. I think there's another problem that consistently identifies a substance as D-methamphetamine hydrochloride 80%. It's identified as that in one spot of the report, later on. It's said that it is methamphetamine, and not to mention the nature of the testing. And I fully grant that Melendez-Diaz, Bohl, Cumming, those are Sixth Amendment cases. But how do we get to know what the lab reports mean and how the tests are done if you have no right to confront the person who performs the test when we know from those cases? We could at least get an affidavit. I mean, I think sentencing, we've held this and it's just true. Sentencing is not quite so bound up with all of these things, the rules of evidence. I would think you'd be doing well to have lab reports, period. And there weren't too many of them here. I think your biggest obstacle is that the courts have, up until this time, taken the same approach that Judge Gilbert did. Like, oh, everybody talked about ICE must be ICE. But just because courts have done things one way historically does not mean that that is the correct way. Can you think of, maybe you know the answer to this, other places in the guidelines where the difference between one drug and an enhanced drug is expressed by a percentage of purity? This is the only instance that I know which tells me that this is a special case. And the evidence should not be typically relied upon in this percentage requirement type case as it is satisfactory in other cases that don't have that. So it's not like powder cocaine bait, you know, crack. So holding here that lab reports are required to show this proof would have applicability only to this guideline is what you're saying? I believe so. And not to mention, if we're worried about some sort of floodgate, these are rare instances where these things are contested. And so when this was contested, that should have put the government on notice. Bring your chemists, bring the people in who can capably testify about what the evidence is to support your burden to establish this is ICE for the enhancement. The government elected not to call chemists and called instead law enforcement officers whose their testimony is, I have no idea. So that's not a good answer. That's not good testimony. That helps us. As far as A, B, C, D, and E goes, didn't send those samples out for additional testing. And then we have all the problems about G1, G2, and I that I talked about earlier. Not the least of which is the inconsistent identification of the substance as variously methamphetamine or D-methamphetamine hydrochloride of an 80% purity rate. This is all sounding like a mouthful, but the principles are fairly simple. And in meth cases, again, if you want a meth sentence, you don't need these lab reports. But if you want an ICE sentence, I think that it's incumbent on the government to meet its burden of proof to satisfy the due process requirements and to come into court with information that should produce so the district court can reach a reliable conclusion and impose sentence based on reliable evidence. And that wasn't done here. I reserve the balance of my time. All right. Thank you. Ms. Robertson. May it please the court. Thank you. Amanda Robertson representing the United States. This sentencing in the district court went how sentencings in the district courts go. The rules of evidence are not applicable. Confrontation clause does not apply. Hearsay is admissible. But there's not even hearsay that most of the drugs that form the basis of Mr. Carnell's sentence had an 80% purity. And you can't deny that that's what it says in the commentary to the guideline where it defines ICE. And obviously the guideline itself has one level for methamphetamine, then another one for methamphetamine actual, and another one, and the same one, I guess, really, for ICE. A lot hangs on this. And I'm actually quite bothered by the approach that the Eighth Circuit has taken that, you know, if people are calling it ICE, it's obviously 80% purity. I've never heard of anything like that. Your Honor, the evidence in this case, the lab reports we had, it was 100% pure. So we're well in excess of the 80% threshold. Weren't those lab reports for the meth that was found on, I'm forgetting her name. Jessica Hughes. They weren't part of the quantity that was attributed to the defendant, right? They were clearly part of the conspiracy, Your Honor. Right, but they weren't part of this two-point whatever, the amount that was attributed to him, right? So it was circumstantial evidence. It didn't show that the amount that he was sentenced for. Well, Your Honor, the defendant said, Jessica Hughes, in his post-arrest, he said, Jessica Hughes is my source. And he talked about amounts he was getting. But why should we take the position that because one little sample is 100% pure, the whole amount that his conspiracy was dealing was? Certainly in the area of heroin, you wind up with widely varying levels of purity, sometimes to tragic effects and sometimes not. But this is basically a do-it-yourself kind of drug, right? And so why should we just assume it's a matter of law that because one little sample is 100% pure, all of it is? Well, Your Honor, one of the issues in this case is right before initially the defendant contested the 2.37 kilogram amount of methamphetamine, he said, I'm good for just 500 to 1.5. As he came into sentencing, he withdrew his amount. Right, so okay, fine. But that means there's that much more you have to prove is 80% pure? And what he indicated is, he said, and of whatever the substance is found, we would stipulate to the gross weight. But that's not purity, right? But he's saying whatever amount the court finds, we're getting ready to have the hearing. So if the court finds it's ice, the defendant says it's going to be 2.37 kilograms. But you need evidence that it's ice. Yeah, but we're talking about, we're not disputing the 2.37 kilos, right? Here, I mean, what the defendant is disputing here is the purity, and that's a different question. And, Your Honor, the law is not currently that all drugs to be counted as relevant conduct have to be drugs, dope in hand, have to be submitted to a lab. But that's why I asked the question. Go ahead, Judge Trober. For the government, you know, to say the drug dealers and users know if a product is pure or not, and can detect the difference between 79% and 81% pure ice. Because it seems to me that that is what the district court was saying. And I'm struggling with it, I must tell you. The government had the burden to prove, even if only by a preponderance of the evidence, that this was ice. And ice has a very specific requirement that it be at least 80% pure. And respectfully, what we have in this case is we have the sample that was seized from Jessica Hughes shortly after the defendant and Hughes had sold it to the co-defendants, Fishard and Hood, and we know that that's demethamphetamine hydrochloride at 100%. We know that. And then what we have is the other evidence of those same witnesses, those same co-defendants, saying, Carnell, the defendants, ice, it's always good. It looks like glass. It looks like shards. But that doesn't tell me whether it's 79% or 81%. Yeah, can you answer my question about is there some point at which it starts to look at shards and that point is 80% so that the visual thing actually means something? I cannot answer that question for you, Your Honor. And it's certainly not in the record. I mean, maybe in the future the government needs to explore that. Because it undercuts the value of that evidence, right? I mean, that's part of the circumstantial evidence to which you point. But if it can look like shards at 55%, well, then that doesn't really tell us a whole lot. And again, based on this record, what we know is the ice that we have that we had analyzed was 100%. And as far as Your Honor saying, well, the guidelines are clear about is it mixture and substance containing methamphetamine, is it actual, is it ice, and ice is this magical 80% with specific… Well, the guidelines are the ones that made it magical. I mean, the guidelines could have defined it some other way in which case we'd have, you know, what do the users call it or what does it look like or, you know, they didn't though. Your Honor, in this case, the sentencing range would have been exactly the same whether it was calculated as ice or it's calculated as actual. So it's a harmless error if it's an error? If you don't have any evidence about the actual either, what you do to determine actual is you take the percentage of the purity… Right, right. So how much was it cut by anything or something? I know. But we don't have any evidence about that. We have testimony that from the users, the people who were selling the ice, that it wasn't diluted, that it wasn't cut. We have the defendant indicate he didn't cut it. So if you took the 2.37 kilograms, which the defendant stipulated was the relevant amount, and you take that times the 100 percent, you're going to end up at offense level 36, which is the same as if it's the D-methamphetamine hydrochloride with a purity of at least 80 percent. I don't think the actual possibility was explored. Go ahead, Judge Rover. Under past circumstances, you know, in which lab technicians were incompetent or corrupt, should Carnell have been denied the opportunity to question the author of a lab report just because of the lower burden of proof at sentencing? And, Your Honor, I would indicate the issues now on appeal are far different than the issues at the sentencing hearing. The issues at the sentencing hearing primarily are, once we got the Jessica Hughes Missouri ice, and it came back from the lab at D-methamphetamine hydrochloride at 100 percent, the argument was, Judge, the government cannot tie the Missouri ice to Southern District of Illinois. There's no evidence Mr. Carnell knew it was coming here. This is where it was going to be distributed. The primary issue was not, we want to talk to this chemist, we have a right to cross-examine her regarding her testing and the like. It was, okay, well, now they have a lab report, but they can't tie the Jessica Hughes Missouri ice to the charged conspiracy, which Judge Gilbert found the evidence of that was overwhelming, too, that the defendant knew that the ice was coming to the Southern District for distribution. I would also indicate, contrary to the defense argument on appeal, there are no inconsistencies in the DEA lab reports. By saying we're doing the confirmation test at the bottom, we test 14 of the 18 units, we confirm their methamphetamine, we do a composite of all 18, and it determines it's D-methamphetamine hydrochloride at 100 percent purity. There's no inconsistency within those DEA lab reports. Does the government, as a matter of course, not test methamphetamine to see the percentage? In Illinois, the penalty is the same as long as it's methamphetamine. So there's no incentive to do anything besides... Oh, you mean for the state labs? Oh, I'm sorry, I misunderstood your question. No, no, no, I'm kind of shifting gears a little bit here, and I'm just thinking through what this rule means and thinking, well, it doesn't seem, if you're sending it to a lab, to see if it's methamphetamine. I mean, does the government typically try to get... It would be easiest for you to prove, right, that it's 80 percent purity if you just get that lab test. Does the government typically do that, or does it typically take this course it did here and rely on circumstantial evidence? Typically, ice cases have been treated historically like every other drug case. We get to use lots of different kinds of evidence. You know, you might have one lab report that says something's cocaine-based, and then everyone's like, yes, he's a crack dealer. I got 50 grams of crack from him. The reason the state labs don't, at least Illinois, is because there's no difference under Illinois law if something's methamphetamine, if it's 1 percent pure or 99 percent pure. And as Detective Krull testified, at the time of this case, Illinois did not have the capability to do the further demethamphetamine, salt and isomer, and the percentage of purity. Do you agree with defense counsel that this is the only instance in the guidelines where there's a percentage, a percentage matters for drugs? I can say as I stand here, I cannot think of something, but I haven't perused the entire guidelines. Sure, sure. I just mapped out the top of your head. Yeah, I cannot, Your Honor. One of the, and again, it's, the government's burden was to prove more likely than not that it was ice. But the problem is in the absence of evidence that addresses this apparently unique drug definition, how can you say it's more likely than not? You just don't know. I would say that's, you know, you lose when in the face of zero evidence, you lose if you have the burden of proof. Well, Judge, it's the same. Let's say we have, we did, it's a heroin case, and we had three seizures of heroin, and one of them was heroin, and one of them ended up being fentanyl, not heroin. But we know from, we know from that one lab report, some of it's heroin. And we know that we have 10 witnesses who say they were getting, that they got 100 grams of heroin from the defendant. But that's just a rough cut, right? That's a different thing. You're not being asked to prove with precision a percentage, right? It either is cocaine or it's not, but you're not trying to prove it's 80% pure. It seems like a percentage is different. I would think a percentage is different. However, again, I will come back to, we're not close in this case. The ice that we have. Well, because everybody uses it. Mr. Carnell uses the term ice, which is what Mr. Carnell said. We're just calling it ice because it's shard, looks like shard. Maybe you get, you know, whatever, an extra pop from it. But I don't think he was testifying that they were drawing the line that it doesn't have those ice characteristics until it's 90% pure. Some evidence like that that would allow you to draw an inference about purity from external observations. And I do think, Your Honor, that purity is a factor we're not used to. And if the government submits, that doesn't mean that we throw out everything we do with drug cases, everything we do with sentencing, the burdens, the standards, and the like. We just have a different burden of proof with this one particular drug if you want the steeper sentence. You could have sentenced this as a methamphetamine case and we wouldn't be here. We could have sentenced it as an actual and we wouldn't be here. Maybe. I'm not as sure about that, but perhaps. Your Honor, Judge Gilbert heard the witnesses testify. And he believed that their testimony was overwhelming and was sufficient, that this was a high-quality, this was high-quality methamphetamine with the appearance of shards and crystalline. Jordan Bishard, a co-defendant, was a perfect example. He testified that the ice I got from Lewis Higgins, which is Government Exhibit I, it was the same quality as the ice I got from Scott Carnell, which is Government Exhibit G1. So you have a user here who says, I got ice from Lewis Higgins, I got ice from Scott Carnell, and they were the same quality. And we have lab reports. We had the lab report when Jordan got the ice from Lewis Higgins, and we have it from Carnell. And it's the same. It's 100%. We're not hovering around the is it 81%, is it 79%. We had 100% purity in this case. Okay. Thank you very much. Thank you. Anything further, Mr. Hillis? I don't know that the ice-worn palette of any of the defendants is sophisticated enough to tell the difference between 80% and 100% pure anything. And so this is a peculiar facet of drug cases where these experts, these people who have dulled their faculties, et cetera, increased their tolerances, and they were to rely on them to be able to say, what I tasted a month ago seemed like the identical substance as what I tasted now. This isn't exactly reliable evidence in my book. The government says about harmless air, but it didn't make a harmless air argument, so it shouldn't be able to make one now. And the judge may be very bothered about the difference between ice as a substance, as a sentencing factor, but the court can read it. And if you read it, I think that you're left with the same questions that we have now. Judge Gilbert wasn't locked into it. The case law maybe didn't alert him to it, but I think that this court should be sensitive to it now. Also, Kayla Kemper said that the ice that she asked for could range from anything from shake and bake to the most pure stuff going. Vuchard claimed that he could tell good ice from bad based on taste. I find that dubious, and I would test it on that if possible. But then lastly, I'm going to have to unfortunately ask the Seventh Circuit to get out its swear jar on this, but it says one piece was good, one piece was bad. This is page 101, and here's the quote for the swear jar. But the rest of it all was bullshit. It was no good. That's different from what the government just said where there's uniform quality, et cetera. There's MSM in one of the samples that is a large amount of this. It's all the same, and we can have confidence in that. It's greatly undermined by the witnesses the government called in the testimony that was elicited at sentencing. Nobody paid much regard to it, but I think this court should. I have nothing further. Thank you. All right. Thank you very much, Mr. Hillis. Excuse me. It would seem as if the users were turned into expert witnesses. Yes. And an expert's testimony, while it can be given, must still be reliable, and these users were not demonstrated to be reliable sources for the conclusions that they reached, Your Honor, and the factual aspects of their testimony undermine their various claims anyway. If ICE is to have a certain look and quality, pricing, et cetera, these are boxes that were not checked through the testimony. This was a burden of the government to establish those things. It just didn't do it. I have nothing further. Thank you. All right. Thank you very much. Thanks as well to the government. We'll take the case under advisement.